Filed 1/25/24  P. v. Madriz CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>PEDRO MADRIZ,<br><br>        Defendant and Appellant. | A165179<br><br>(San Mateo County<br>Super. Ct. No. 17-SF-002213-A) |

        While riding as a passenger in a car, defendant Pedro Madriz shot a man affiliated with a rival gang faction.  Four days later, while riding in another car, Madriz urged the driver to flee from law enforcement, which resulted in a car crash that seriously injured some of the car's other passengers.  Based on these two incidents, a jury convicted Madriz of several felonies, including attempted murder, and numerous gang-related charges.  He was sentenced to 39 years and eight months to life in prison.

        On appeal, Madriz contends that reversal is required under Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333), which imposes new limitations on the prosecution of gang-related charges, and which took effect after Madriz was tried but before he was sentenced.  In response to the new law, the trial court dismissed his convictions of the gang-related charges.  Madriz claims, however, that he is entitled to reversal of all his convictions because trial on the gang charges was not bifurcated.  In addition, he claims

1

the jury instruction on flight was legally incorrect. We reject these claims, order the correction of clerical errors in the abstract of judgment, and affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

*A. Background*

At the time of the February 2017 crimes, 23-year-old Madriz was a member of Midtown Menlo Norteños (MMN), a Norteño gang subset in the area of East Palo Alto and East Menlo Park. Madriz had numerous gang-related tattoos, including the word "Norte" above his left eye and the letters "MMN" by his right eye.

Around 2012, MMN split from another Norteño subset in the same area, Midtown and Menlo (M&M), due to "a rift within the gang" over their name. There was significant violence, including shootings, between MMN and M&M for the next two years. Although the violence diminished after 2014, the two factions remained rivals.

*B. The Shooting*

On the afternoon of February 21, 2017, Jimmy H., who was in his late teens, left his East Palo Alto home on his bicycle to meet his girlfriend's sister. After meeting her, Jimmy H. started biking home.

Jimmy H. testified that before the meeting, he had noticed Madriz in the backseat of "a blue Toyota Prius or Honda" sedan and "gave him a head-nod," which Madriz returned. Jimmy H. had met Madriz several years before and had interacted with him at least five times, usually at neighborhood "kick-backs" attended by gang members. Although Jimmy H. was not a gang member, after the MMN/M&M split he tended to be friendly with members of M&M. He testified that after the split he was beat up twice by MMN

2

members.  Nonetheless, in recent years he had distanced himself from his gang associates, and he did not think he and Madriz "had any problem."

As Jimmy H. reached the EPA Wireless store on his way home, the blue car caught up with him.  Madriz was still in the backseat, and Jimmy H. could see four other people in the car.  Jimmy H. testified that he knew one of them as "Shadow," an MMN member who beat him up on one of the previous occasions, but did not remember recognizing any of the car's other occupants.[1]

Madriz asked Jimmy H., "Where are you from?," which Jimmy H. understood to be a question about his gang affiliation.  Jimmy H. then saw Madriz, who was only three or four feet away, point a silver handgun out the car window.  Jimmy H. heard three gunshots and felt pain in his side and buttocks.  He got off his bike and ran into EPA Wireless, where a store clerk called the police.  Jimmy H. was treated at the hospital for a through-and-through gunshot wound to his right side and back, an injury that still caused him pain.

At 1:15 p.m., East Palo Alto's Shot Spotter system recorded three gunshots fired within one second in the vicinity of EPA Wireless.  Three shell casings and a bullet fragment were recovered at the scene, and there were two bullet holes in an outside wall of EPA Wireless.  No fingerprints could be recovered from the shell casings.  Surveillance footage from area businesses showed the movements of Jimmy H. and a Prius leading up to the shooting,

---

[1] Shadow, whose real name is Enrique S., worked for a construction company at the time.  Timecard records showed that he worked at a job site in Albany from approximately 7:00 a.m. to 3:00 p.m. on the day in question.  Jimmy H. told the police that Shadow was in the blue car, but at trial he testified it was possible the person was actually "Little Shadow," Shadow's younger brother.  It also appears from the record that Jimmy H. failed to identify Shadow in a photographic line-up the day after the shooting.

culminating in "a hand outstretched from the car" right before Jimmy H. went into EPA Wireless.

At the scene, Jimmy H. told a police officer that he knew who shot him but could not recall the man's name. Jimmy H. later identified Madriz in a photographic line-up as "Fat Boy," Madriz's gang moniker, but refused to initial the identification. Jimmy H. testified that he was initially reluctant to tell the police who shot him because he was afraid of gang retaliation, but he decided "it was the best thing to do" because he was "not in that life any[]more."

Both sides presented expert testimony involving data extracted from Madriz's cell phone. The phone's location data tended to show that Madriz was in the vicinity of EPA Wireless at the time of the shooting, although some discrepancies were impossible to explain. Madriz's sister-in-law testified that his grandmother and great-grandmother lived on the same street indicated by some of the relevant location data, and he often visited them.

C.    *The Car Chase*

Four days after the shooting, on February 25, 2017, 18-year-old Stephanie D. and her friend, 14-year-old Tatiana P., drove to a Redwood City park to meet Madriz and Alexis S., a member of a Redwood City Norteño subset. The group left the park in Alexis S.'s Nissan Altima and went to a nearby abandoned house, where they consumed drugs and alcohol. After buying more alcohol, they drove to East Palo Alto to pick up another gang member, Stevie J. Stevie J. got in the driver's seat, and Madriz, who had been driving, moved to the front passenger's seat. Tatiana P., Stephanie D., and Alexis S. were in the backseat.

4

The group drove around East Palo Alto for a while, smoking marijuana and drinking. Stephanie D. testified that at one point, she saw Madriz pull out a gun from "in between [his] legs or on the floor," hold it briefly, and replace it out of sight. Tatiana P. also saw Madriz holding a gun sometime during the ride.

Eventually, someone in the Altima said, "We got blurped," and the girls noticed police lights. Stevie J. asked if he should stop, and Madriz indicated he should take the police on a high-speed chase. Stephanie D. testified that Madriz stated he had a warrant out for attempted murder, but Tatiana P. testified that he did not specify what the warrant was for.[2] During the ensuing chase, the girls repeatedly yelled at Stevie J. to pull over and let them out of the car, but he did not do so.

A San Mateo County sheriff's deputy testified that around 9:20 p.m. that night, he was driving in a patrol vehicle with other members of the county gang task force. He noticed an Altima in front of them, which was playing loud music, and saw "a lit cigarette [discarded] out of the [front] passenger window." The patrol vehicle activated its lights to initiate a stop, but the Altima accelerated instead of pulling over. In the ensuing chase through East Palo Alto, which has a uniform speed limit of 25 miles per hour, the Altima ran four stop signs and reached 70 miles per hour.

Eventually, the Altima crashed into a tree. The sheriff's deputy extracted Madriz from the front passenger's seat and noticed a handgun on the passenger's-side floorboard. The gun, a fully loaded Springfield Armory nine-millimeter, was of a different caliber than the shell casings from the

---

[2] The defense introduced evidence that Stevie J.'s driver's license was suspended at the time, implying this gave Stevie J. an independent reason not to pull over.

February 21 shooting, and no usable DNA or fingerprints were recovered from it. The deputy then arrested Madriz, the only one of the car's occupants who was not seriously injured.

Stephanie D. sustained numerous injuries, including breaking her hip, pelvis, and ribs and severing her sciatic nerve and tendons in her knee and hand. Her injuries required four surgeries. At the time of trial, she could not feel one of her feet, leaving her vulnerable to sprained ankles, and she had arthritis and carpal tunnel syndrome in her injured hand. Tatiana P. fractured her pelvis, and she continued to experience discomfort from the injury.

### D. Other Gang Evidence

A sergeant in the San Mateo County Sheriff's office testified as a gang expert. He explained that Norteños are affiliated with the Nuestra Familia prison gang and use certain signifiers, including the color red, references to the north, and symbols referring to "N" being the fourteenth letter of the alphabet. In addition to providing information about MMN and M&M discussed above, the sergeant testified that both subsets' primary activities include violent crimes, firearm possession, distribution of narcotics, and robbery and burglary.

The sergeant opined that Madriz was an active MMN member at the time of the shooting and car crash. This opinion was based on other evidence besides Madriz's gang-related tattoos. For example, a Menlo Park police officer testified that in 2009, he searched Madriz and found a cell phone with the number 14 carved in the back and a binder with Norteño symbols on it. In 2011, another Menlo Park police officer had a consensual interaction with Madriz, who was with two other men wearing red clothing. The officer

6

observed gang-related tattoos on Madriz, who told the officer that he was an active gang member.

Photographs and recordings of Madriz also supported the sergeant's opinion that Madriz belonged to MMN. There were photographs of Madriz with other Norteños in which Madriz's fingers were shaped in the letter M. The jury also viewed a video in which Madriz was "claiming . . . [MMN], referencing his own tattoos connected to that gang, as well as his prior associations with other [MMN] members."

To support the gang charges, the sergeant described three predicate offenses committed by MMN members. First, in 2013, Madriz was convicted of robbery with a gang enhancement. Second, also in 2013, another MMN member was convicted of assault with a firearm causing great bodily injury committed for the benefit of a gang. Third, in 2015, yet another MMN member was convicted of unlawful possession of a firearm with a gang enhancement and possession of methamphetamine for sale.

Based on a hypothetical tracking the facts here, the sergeant opined that the shooting was gang-related and committed for the benefit of MMN. He explained that Norteños are "expected to inflict violence upon [their] enemies," and shooting someone associated with a rival faction would increase the shooter's status in the gang and the gang's status as a whole. The sergeant also opined that the car chase was in association with and for the benefit of MMN, because gang members are supposed to help other members avoid criminal liability.

*E.     Procedural History*

The operative information charged Madriz with seven felony counts: attempted premeditated murder, assault with a firearm, and unlawful discharge of a firearm from a motor vehicle, based on the February 21

7

incident; possession of a firearm by a felon, carrying a loaded firearm in public, and evading a peace officer causing injury, based on the February 25 incident; and active participation in a gang, based on both incidents.[3] Numerous gang, firearm, and great-bodily-injury enhancements were alleged in connection with the first six counts.[4] Finally, various allegations were made based on two of Madriz's prior convictions, the one for robbery with a gang enhancement and another for carrying a loaded firearm in public.[5]

The jury hung on the allegation that the attempted murder was premeditated, and it was dismissed. Otherwise, the jury convicted Madriz of

---

[3] The charges were brought under Penal Code sections 187, subdivision (a), 189, and 664, subdivision (a) (attempted premeditated murder), 245, subdivision (a)(2) (assault with firearm), 26100, subdivision (c) (discharge of firearm from vehicle), 29800, subdivision (a)(1) (possession of firearm by felon), 25850, subdivision (c)(6) (carrying loaded firearm in public), 186.22, subdivision (a) (active participation in gang), and Vehicle Code section 2800.3, subdivision (a) (evading peace officer). All further statutory references are to the Penal Code unless otherwise noted.

[4] The gang allegations were made under section 186.22, subdivision (b). The firearm allegations were made under sections 12022.55 (all February 21 charges), 12022.53, subdivisions (b)–(e) (attempted murder), and (b)–(d) only (discharge of firearm from vehicle), and 12022.5, subdivision (a) (assault with firearm). The great-bodily-injury allegations were made under sections 12022.7, subdivision (a), and 1192.7, subdivision (c)(8), as to all the February 21 charges and the charge of evading a peace officer. The firearm allegations under section 12022.53, subdivisions (b) and (c), as to the charge of discharging a firearm and the great-bodily-injury allegations as to the charge of evading a peace officer were not submitted to the jury and ultimately dismissed.

[5] These allegations were made under sections 1170.12, subdivision (c)(1), and 667, subdivision (a)(1), based on 2013 convictions under sections 212.5 and 186.22, subdivision (b)(1) (robbery with gang enhancement), and 25850, subdivision (c)(6) (carrying loaded firearm in public). An allegation under section 667.5, subdivision (b), was dismissed before the trial court considered it.

all the charges and accompanying allegations submitted to it. The trial court then found true the prior-conviction allegations.

The trial concluded in June 2021, but Madriz was not sentenced until the following April. In the meantime, Assembly Bill No. 333 took effect, and Madriz relied on the legislation to move for a new trial on the substantive gang count and the gang-related enhancements, including the firearm enhancement under section 12022.53, subdivision (e)(1). The People conceded that a new trial was warranted, and at their request the trial court dismissed all the gang charges of which Madriz was convicted.

The trial court then sentenced Madriz to 39 years and eight months to life in prison, composed of the low term of five years, doubled, for attempted murder, and 25 years to life for the accompanying firearm enhancement under section 12022.53, subdivision (d); a consecutive term of eight months, doubled, for being in a felon in possession of a firearm; and a consecutive term of 20 months, doubled, for flight from a peace officer. The court struck the five-year enhancement under section 667, subdivision (a)(1), in the interest of justice, and imposed and stayed terms for the remaining convictions and enhancements.

## II.
### DISCUSSION

#### A. *Madriz Is Not Entitled to Relief Under Section 1109.*

Madriz challenges his convictions based on section 1109, a statute added by Assembly Bill No. 333 that entitles defendants to bifurcate trial on gang charges from trial on non-gang charges. He argues that since bifurcation did not occur here, a large amount of "highly prejudicial gang evidence" was improperly introduced, requiring reversal. Even assuming that section 1109 is retroactive, we conclude that the lack of bifurcation was harmless.

9

The California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.), which was enacted in 1988 " 'to eradicate "criminal activity by street gangs," ' " created a sentencing enhancement for felonies "committed for the benefit of, at the direction of, or in association with a criminal street gang." (*People v. Tran* (2022) 13 Cal.5th 1169, 1205–1206 (*Tran*); § 186.22, subd. (b)(1).) It also created a substantive crime of "actively participat[ing] in a criminal street gang." (§ 186.22, subd. (a).)

Effective January 1, 2022, Assembly Bill No. 333 changed the law governing gang enhancements and the crime of active participation in a street gang in two primary respects. (See *Tran*, *supra*, 13 Cal.5th at p. 1206.) First, the legislation narrowed the scope of section 186.22 in several ways, thus changing the elements required to prove guilt. (See *Tran*, at pp. 1206–1207.) This aspect of Assembly Bill No. 333, which is retroactive under *In re Estrada* (1965) 63 Cal.2d 740, is not implicated here because there is no dispute that the trial court appropriately responded to the new legislation by overturning Madriz's gang conviction and enhancements. (*Tran*, at pp. 1206–1207.)

Second, the legislation added section 1109. This statute requires, upon a defendant's request, that gang enhancements and charges of active participation in a street gang be tried separately from other offenses.[6] (*Tran*, *supra*, 13 Cal.5th at p. 1206; § 1109, subds. (a) & (b).) "If the proceedings are bifurcated, the truth of [a] gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*Tran*, at

---

[6] Before trial, and thus before Assembly Bill No. 333 took effect, Madriz unsuccessfully moved on constitutional grounds and under Evidence Code section 352 to bifurcate trial of the gang charges from the non-gang charges. He does not argue on appeal that the trial court improperly denied that motion under then-applicable law.

p. 1206.) Similarly, a charge of active participation in a street gang "shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime." (§ 1109, subd. (b).)

Initially, we need not resolve the parties' dispute whether section 1109 is retroactive under *In re Estrada, supra,* 63 Cal.2d 740. The Courts of Appeal are split on the issue, which is currently before our state Supreme Court. (*Tran, supra,* 13 Cal.5th at p. 1208; *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743.) In *Tran,* the Supreme Court declined to resolve the split, "conclud[ing] that any asserted error in failing to bifurcate was harmless." (*Tran,* at p. 1208.) We adopt a similar approach here, concluding that the lack of bifurcation was harmless.

Madriz asserts that "the lack of bifurcation in his case is a structural error and that automatic reversal is warranted." But *Tran* flatly rejected the same contention. (*Tran, supra,* 13 Cal.5th at p. 1208.) Madriz does not even cite *Tran,* which was decided several months before he filed his opening brief, much less offer any reason this holding is not binding on us. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Alternatively, Madriz argues that "the prejudice flowing from the lack of bifurcation should be evaluated under the federal standard of *Chapman v. California* (1967) 386 U.S. 18." Again, he fails to acknowledge *Tran* in making this argument. *Tran* held that unless the failure to bifurcate under section 1109 rendered a trial "fundamentally unfair," the error's prejudicial effect is assessed under the state-law standard of *People v. Watson* (1956) 46 Cal.2d 818, which asks whether it is reasonably probable the defendant would have obtained a better result absent the error. (*Tran, supra,* 13 Cal.5th at p. 1209; *Watson,* at p. 836.) In his reply brief, Madriz appears to claim broadly that gang evidence *always* renders a trial fundamentally

11

unfair, but *Tran* forecloses that position, and he makes no attempt to demonstrate that his trial in particular was fundamentally unfair. Thus, we turn to address whether the lack of bifurcation was prejudicial under *Watson*.

Madriz argues that "all of [the] gang testimony" from prosecution witnesses "was irrelevant given the fact that the primary issue in the case as to the shooting was simple: Was [he] the one who shot [Jimmy H.]?" In fact, gang evidence was *highly* relevant to the shooter's identity. Jimmy H. identified Madriz by Madriz's gang moniker and his face tattoos, the latter of which the jurors could see for themselves. And the two men's prior interactions primarily occurred during gang hangouts. Furthermore, gang evidence was relevant to other significant issues in the case, including the motive for the shooting and the impetus for the car chase.

In resisting this conclusion, Madriz argues in his reply brief that Jimmy H.'s testimony "*negated* any notion of motive," Jimmy H.'s "identification was *unavailing* where [Jimmy H.] was initially unable to identify the shooter," and "cellular phone evidence established that it was *impossible* that [Madriz] was the shooter." (Italics added.) These arguments improperly invite us to reweigh the evidence. Although Jimmy H. testified that he was surprised Madriz shot him, it was telling that Jimmy H. was affiliated with a rival subset and Madriz asked him where he was from before the shooting. The jury was entitled to infer that Madriz had a gang-related motive for the shooting, even if Jimmy H. found that hard to believe. As for Madriz's other points, the jury clearly accepted Jimmy H.'s identification and did not find the discrepancies in the cell-phone data conclusive. Overall, the evidence hardly precluded a finding that Madriz was the shooter.

Finally, Madriz also argues that prejudice is "evident from the fact that the prosecution spent much of its closing argument discussing [his] gang

12

affiliations." To be sure, the closing arguments centered on gang evidence more than they would have had the gang charges been tried separately. But although Madriz quotes the prosecution's arguments at length, none of the statements he identifies were especially inflammatory. The mere fact that the prosecution argued for the jury to return favorable verdicts on the gang charges does not establish that the failure to bifurcate them was prejudicial.

In short, we conclude that "it is not reasonably likely that a bifurcated trial would have changed the jury's verdict" on the non-gang charges. (*Tran*, *supra*, 13 Cal.5th at p. 1210.) Jimmy H. unambiguously identified Madriz as the shooter based on significant prior contact with him, and Stephanie D. and Tatiana P. agreed that Madriz directed the car chase to occur. The evidence of the other non-gang counts and allegations was also strong. Finally, even if trial had been bifurcated, at least some gang evidence was likely still admissible on key issues such as identity and motive. Thus, even if we assume Madriz was entitled to the benefit of section 1109, the lack of bifurcation was harmless.

### B.    *Madriz's Challenge to CALCRIM No. 372 Fails.*

Madriz also claims the trial court erred by giving CALCRIM No. 372, the form instruction on flight. We are not persuaded.

The jury was instructed under CALCRIM No. 372 as follows: "If the defendant fled or tried to flee after . . . he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself." Madriz did not object below to either the giving of a flight instruction or the given instruction's language.

13

The focus of Madriz's claim is that CALCRIM No. 372 is legally incorrect. The Attorney General does not argue that Madriz forfeited this claim by failing to raise it below, and we agree with Madriz that he did not. (See *People v. Franco* (2009) 180 Cal.App.4th 713, 719 ["[t]he rule of forfeiture does not apply . . . if the instruction was an incorrect statement of the law" or "affected the defendant's substantial rights"].) We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In deciding whether an instruction is " 'incorrect or incomplete, we evaluate the instructions given as a whole, not in isolation.' " (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

Madriz claims that CALCRIM No. 372 conflicts with section 1127c. That statute provides, "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

Madriz contends that unlike the section 1127c instruction, CALCRIM No. 372 "presumes an awareness of guilt when a defendant is alleged to have fled or tried to flee." According to him, CALCRIM No. 372's statement that flight "may show" awareness of guilt "reverses the onus set forth in [section] 1127c," which states that flight "is not sufficient" to show guilt. But the fact that CALCRIM No. 372 and section 1127c "communicate[] [the same] ideas in the opposite order" does not render the former instruction unlawful.

14

(*People v. Paysinger* (2009) 174 Cal.App.4th 26, 31.)  As *Paysinger* observed, CALCRIM No. 372 goes on to say that evidence of flight is insufficient alone to establish guilt, "and we certainly do not view one part of an instruction in isolation from another part." (*Paysinger*, at p. 31.)  To the extent Madriz complains that CALCRIM No. 372 states that flight "may show" awareness of guilt while section 1127c does not do so explicitly, we agree with *Paysinger* that the difference is legally insignificant.  (*Paysinger*, at p. 31.)

Citing *People v. Wright* (1988) 45 Cal.3d 1126, Madriz also claims that CALCRIM No. 372 is "improperly argumentative."  But he does not explain his reasoning, other than to quote *Wright*'s observation that jury instructions " 'should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue.' " (*Wright*, at p. 1135.)  We are unable to discern how CALCRIM No. 372 violates this principle.  Moreover, as the Attorney General observes, our state Supreme Court has repeatedly rejected claims that CALCRIM No. 372's predecessor, CALJIC No. 2.52, is unduly argumentative.  (*People v. Boyce* (2014) 59 Cal.4th 672, 691 [collecting cases].)

In short, Madriz fails to convince us that CALCRIM No. 372 is legally erroneous in any respect.  Therefore, the trial court did not err by instructing the jury under it.

C. *Clerical Errors in the Abstract of Judgment Must Be Corrected.*

Finally, we address certain discrepancies between the trial court's oral pronouncement of sentence and Madriz's abstract of judgment.  Even though the parties do not address these discrepancies, an appellate court " 'may correct such errors on its own motion.' " (*People v. Mitchell* (2001) 26 Cal.4th 181, 186–187.)

To begin with, an indeterminate abstract of judgment was prepared even though Madriz was not convicted of any substantive counts carrying an indeterminate sentence. The attempted murder conviction, on which Madriz was sentenced to 10 years, is listed on this abstract as carrying a sentence of 25 years to life. In fact, that was the sentence for the accompanying firearm enhancement under section 12022.53, subdivision (d), which does not appear on the indeterminate abstract at all. The attempted murder is also described as "Attempted: Willful, Deliberate, and Premeditated [Murder]" even though the jury hung on the premeditation allegation. The indeterminate abstract of judgment must be stricken entirely, and the determinate abstract must be amended to show a 10-year term for attempted murder, a 25-years-to-life term on the firearm enhancement, and stayed terms for the other accompanying enhancements.

There are also several errors on the determinate abstract of judgment. This abstract does not list any of the enhancements for any of the remaining five convictions and must be amended to do so. It also reflects that the sentence for being a felon in possession of a firearm was 8 months when it was actually 16 months and that the sentence for evading a peace officer was 20 months when it was actually 40 months. Finally, the determinate abstract of judgment must be amended to include the fines and fees imposed and Madriz's custody credits, both of which appear only on the indeterminate abstract.

## III.
### DISPOSITION

The judgment is affirmed. The trial court is directed to strike the indeterminate abstract of judgment and prepare an amended determinate abstract of judgment consistent with this opinion. A certified copy of the

16

amended abstract shall be sent to the Department of Corrections and Rehabilitation.

_____
Humes, P. J.


WE CONCUR:



_____
Banke, J.



_____
Castro, J.*



     *Judge of the Superior Court of the County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Madriz*  A165179


18